# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KING DRUG COMPANY OF FLORENCE, INC., et al., | : : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | No. 2:06-cv-1797 |
| CEPHALON, INC., et al., | : : | |
| Defendants. | : : | |
| FEDERAL TRADE COMMISSION, | : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | No. 2:08-cv-2141 |
| CEPHALON, INC., | : : | |
| Defendant. | : : | |

**Goldberg, J.**                                                                                           **September 11, 2013**

### Memorandum Opinion

Presently before the Court is a motion to compel the production of documents filed by the Federal Trade Commission ("FTC") and joined by Direct Purchasers of a modafinil product, Provigil, manufactured by Defendant, Cephalon, Inc. ("Cephalon"). Plaintiffs seek an order requiring Cephalon to produce documents requested during discovery which have either been withheld or redacted based upon attorney-client privilege.

The documents in question fall into three categories: (1) minutes from meetings of the Cephalon Board of Directors in January and May 2006; (2) documents shared with or created by a business consulting company, Clarion Healthcare Consulting, LLC, in connection with work it performed for Cephalon; and (3) documents created by non-attorney employees at Cephalon

related to the settlement of certain patent infringement lawsuits.  For the reasons that follow, we find that the documents at issue were properly redacted or withheld.

**I.    Background**

A more detailed recitation of the facts surrounding this litigation can be found in the Court's prior Opinion.  (See Memo. Op., Mar. 29, 2010, Doc. No. 58.)  The FTC's principal allegation is that agreements entered into by Cephalon in conjunction with its settlement of a patent infringement suit related to its modafinil drug, Provigil, against four generic drug manufacturers, violated antitrust laws.  These agreements were entered into in 2005 and 2006, and included substantial payments to the generic companies, which, according to the FTC, were made in exchange for the generics' promise to stay off of the modafinil market.  Since the litigation began, the Court has held two separate trials regarding the patents covering Provigil, and, just last term, the United States Supreme Court clarified the standard that district courts should apply in assessing the legality of agreements like those at issue here (commonly called "Reverse Payment" settlements).  See Federal Trade Comm'n v. Actavis, 133 S.Ct. 2223 (2013).  This litigation is now in its final stages of discovery.

The discovery dispute presently before the Court has narrowed substantially since the FTC filed its motion, and concerns fifty four documents, which the parties have divided into the three categories identified above. (See Aug. 8, 2013 Hrng., FTC Ex. A.)

The first category consists of redactions to minutes and memoranda from meetings of the Cephalon board of directors in January and May 2006.  With regard to the January 2006 board of directors meeting, Cephalon has redacted a portion of a written "Executive Summary" distributed by its President, Frank Baldino, Jr., as well as portions of minutes from certain

meetings of a Special Committee tasked with overseeing the Provigil litigation on behalf of the board. (Zakreski Aff., Resp. Ex. 7, ¶¶ 16-20.) According to Cephalon, in the redacted portion of the Executive Summary, Dr. Baldino discusses legal advice he received from in-house counsel regarding ongoing settlement discussions in the Provigil patent litigation. (Id., ¶¶ 17-18.) Similarly, Cephalon asserts that Baldino relayed the same information to the Special Committee.

With regard to documents from Cephalon's May 2006 board of directors meeting, only one redaction is at issue. The minutes contain a paragraph that describes statements by Cephalon's general counsel, John Osborn, regarding the terms of the settlement agreements. Cephalon asserts that this paragraph also contains legal advice from Mr. Osborn regarding intellectual property and regulatory matters implicated by the terms of the agreements. (Id., ¶¶ 19-20.)

The second category, which consists of thirty seven documents, are communications between Cephalon and a third-party consulting firm, Clarion Healthcare, LLC ("Clarion"). Clarion was hired by Cephalon in 2005 to assist its employees in developing a plan to maximize the commercial success of Cephalon's modafinil products, which included Provigil, and two other drugs that had yet to reach the market, Sparlon and Nuvigil. (Hrubiec Aff., Resp. Ex. 8, ¶ 7.) Clarion's consultants and a group of Cephalon employees from various departments were referred to as the Business Strategy Team ("BST"). Clarion's role on the BST was to provide expertise related to the evaluation of modafinil commercial opportunities, and the intellectual property and regulatory risks associated with different business strategies. (Brookes Aff., Resp. Ex. 9, ¶ 5; Mot. Ex. 25, p. 1.)

3

In this role, Clarion worked closely with the BST, and had office space at Cephalon. Clarion's consultants had daily contact with members of the BST, and provided managerial and strategic support, as well as assistance on presentations to Cephalon's senior management. (Id., ¶¶ 8-9.) Additionally, Clarion was often required to consult with Cephalon's attorneys on intellectual property and regulatory issues, and entered into a confidentiality agreement in connection with its consultant role. (Brookes Aff., ¶¶ 5-7.) According to Cephalon, the documents shared with Clarion that it redacted or withheld contain either legal advice, information that Cephalon's attorneys requested from the BST, or requests by the BST for legal advice from Cephalon's attorneys. (See Hrubiec Aff., ¶¶ 8-30.)

The final category consists of fifteen documents which were drafted by Cephalon non-attorney employees and executives. These documents were circulated to both in-house attorneys and non-attorney employees at Cephalon. According to affidavits submitted by Cephalon's associate general counsel, Randall Zakreski, and former in-house counsel, Robert Hrubiec, many of these documents were created and sent to them at their request, in order to allow them to more ably provide Cephalon with legal advice on intellectual property issues regarding Provigil and the ongoing patent litigation. (Zakreski Aff., Resp. Ex. 7, ¶¶ 21-28; Hrubiec Aff., Resp. Ex. 8, ¶¶ 31, 33-4, 37, 41.) Hrubiec and Zakreski state that the other documents in this category are requests by employees for legal advice, their responses to those requests, or documents related to litigation strategy in the Provigil patent litigation. (Hrubiec Aff., ¶¶ 33, 35-6, 38, 40.)

After Cephalon withheld these documents, the FTC filed the motion to compel presently at issue. An evidentiary hearing and oral argument was held on August 8, 2013, during which

the Court ordered that the documents be produced for an in camera review in order to determine which, if any, of the documents are subject to attorney-client privilege.

## II.     Legal Standard

In order "to encourage full and frank communication," the attorney-client privilege protects communications between attorneys and clients from compelled disclosure. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege applies to any statement that is "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000). "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." In re Teleglobe Comm. Corp., 493 F.3d 345, 360 (3d Cir. 2007) (quoting id., § 70). "The privilege extends to verbal statements, documents and tangible objects conveyed by both individual and corporate clients to an attorney in confidence for the purpose of any legal advice." Haines v. Liggett Group, Inc., 975 F.2d 81, 90 (3d Cir. 1992).

## III.    Discussion

The FTC's principal argument, which it raises with regard to all of the challenged documents, is that the redacted and withheld communications were not made for the purpose of obtaining or providing legal advice, but were instead communications of facts for the purpose of making business decisions. The focus of our inquiry in determining whether the communications at issue are privileged, however, must be whether those communications were for the purpose of obtaining legal advice, and not whether those communications contained facts. "When determining whether a document is privileged, a Court must bear in mind that: '[a] fact is

one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'what did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.'" Simmons v. Children's Hosp. of Pa., 2002 WL 31968951, at *2 (E.D. Pa. June 24, 2002) (quoting Upjohn, 449 U.S. at 396).

At the same time, the mere presence of an attorney, or the inclusion of an attorney as one of many recipients of a communication between corporate employees, will not transform a normal business communication into a communication subject to the attorney-client privilege. SmithKline Beecham Corp. v. Apotex Corp., 232 F.R.D. 467, 479 (E.D. Pa. 2005). Rather, "[p]rivilege is restricted to those instances where employees secure legal, not business, advice or services, or where in-house counsel provides legal advice or legal services to corporate personnel." Id. (citing Kramer v. Raymond Corp., 1992 WL 122856, at *1 (E.D. Pa. May 26, 1992)). We must be mindful that the purpose of the privilege is to protect "those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." Fisher v. United States, 425 U.S. 391, 403 (1976).

Whether a particular communication was made for legal or business purposes is largely a factual determination, and one which must be made on a case by case basis. Wachtel v. Health Net, Inc., 482 F.3d 225, 230-31 (3d Cir. 2007). As such, an in camera review of the documents at issue here was necessary. Many of the redacted documents at issue (e.g., minutes from meetings of the board of directors) would, in all likelihood, be expected to contain both legal and business-related communications. Additionally, although Cephalon submitted a detailed privilege log and several affidavits in support of its argument that the communications at issue

6

were legal in nature and therefore properly withheld, the log descriptions and the affidavits were too general to permit the Court to resolve the dispute without reviewing the communications themselves. This was, of course, necessary to some extent as the party asserting the privilege faces the difficult task of providing enough detail to establish its claim of privilege, but not so much detail that it inadvertently discloses the content of the communications. Accordingly, our determination that an in camera review of the documents was necessary should not be viewed as an indication of any deficiency in Cephalon's privilege log or support of its privilege claim.

After a thorough in camera review of the communications at issue, we turn to whether those communications were for the purpose of providing or obtaining legal advice and are subject to the attorney-client privilege, or, rather, were for business purposes and should be disclosed.

### A.   Board of Directors Meeting Minutes and Memoranda

The FTC first challenges the redaction of minutes from certain meetings of the Cephalon board of directors in early 2006. (Challenge Nos. 13-14.) "Primarily at issue is whether the communications memorialized by the minutes were made for the purpose of [providing or] obtaining legal advice." In re Ford Motor Co., 110 F.3d 954, 964-65 (3d Cir. 1997); abrogated on other grounds by Mohawk Industries, Inc. v. Carpenter, 558 U.S. 100 (2009). The redacted communications in the minutes at issue reflect statements by either then-CEO of Cephalon, Frank Baldino, Jr., or Cephalon's General Counsel, John Osborn.

Cephalon redacted two statements by Dr. Baldino from the minutes of the board of director's meetings. In the first, which is reflected in the "Executive Summary" of the January 31, 2006, meeting, Dr. Baldino describes the status of settlement discussions with the generic

drug manufacturers in the Provigil patent infringement suits that were pending at the time. (Challenge No. 13, Jan. 31, 2006 Executive Summary, p. 1.) In the second, contained in minutes from the meeting of the Special Committee designated to oversee the Provigil infringement litigation, Baldino describes the specific terms of a proposed settlement agreement related to the litigation. (Id., Minutes of Dec. 4, 2005, Special Comm. Mtg., p. 1.) According to the affidavit submitted by Randall Zakreski, in both statements Baldino is relaying information he learned from private conversations with Zakreski and General Counsel, John Osborn. (Zakreski Aff., ¶¶ 17-18.)

Based upon the content of these statements, and the fact that they reflect advice or information Baldino received from Cephalon's General Counsel, it is clear that the communications had a legal rather than a business purpose. Specifically, Baldino's statements were made in an effort to assist the board in making an informed decision regarding the settlement of the Provigil patent infringement litigation. The statements specifically relayed information from Cephalon's attorneys regarding the status and terms of those agreements. As such, the statements were made for the purpose of providing legal advice and are protected by the attorney-client privilege.

We also conclude that the redacted statements by General Counsel, John Osborn, are privileged as well. These statements similarly relate to the status of settlement negotiations in the Provigil infringement litigation, and concern the details and regulatory impact of certain proposed settlement and licensing agreements. Like the statements by Dr. Baldino, these communications were made to assist the board in making an informed settlement decision. Further, the communications were made directly by Cephalon's attorney. Cephalon properly

8

redacted these statements from the minutes of its board of directors meetings when it produced those minutes in discovery.

### B. Clarion Documents

The FTC next challenges Cephalon's privilege claims related to documents created by or shared with Clarion. The FTC argues that these documents are not subject to attorney-client privilege for two reasons: (1) the Clarion consultants were not privileged persons, and disclosure of these documents to Clarion waived the attorney-client privilege; and (2) the documents are predominantly business related, and were not created for the purpose of providing or obtaining legal advice. After careful review of redacted and withheld portions of these documents, we disagree with the FTC's arguments for the following reasons.

The first argument advanced by the FTC is essentially a legal one concerning the application of the attorney-client privilege to third-party consultants hired by a corporation. Traditionally, the attorney-client privilege covers confidential communications between a corporation's attorneys and its employees, and disclosure of those communications to third parties often results in waiver of the privilege. See, e.g., In re Chevron Corp., 633 F.3d 153, 165-66 (3d Cir. 2011); Westinghouse Elec. Corp. v. Repub. of Phil., 951 F.2d 1414, 1427 (3d Cir. 1991). However, many courts have extended the privilege to non-employees of the corporation where those individuals act as "the functional equivalent" of employees. E.g., In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 218-20 (S.D.N.Y. 2001). The extension of the privilege in these circumstances is a recognition that corporations often act through non-employee consultants, and "there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation

9

and possesses the information needed by attorneys in rendering legal advice." Id. at 219. The issue presented here is whether the Clarion consultants were the "functional equivalent" of Cephalon employees in their role assisting the BST.

The FTC argues that Clarion's consultants do not fall within the scope of the privilege because they were hired for business rather than legal purposes. It urges that the attorney-client privilege extends to third-party consultants only where those consultants were hired to perform a function "necessary in the context of actual or anticipated litigation." In re Bristol Myers Squibb Sec. Litig., 2003 WL 25962198, at * 4 (D.N.J. Jun. 25, 2003) (citing In re Bieter Co., 16 F.3d 929 (8th Cir. 1994)). Under the test advanced by the FTC, "[t]he key to deciding if a consultant should be protected . . . is if the consultant acts for the corporation and possesses the information needed by attorneys in rendering legal advice." Id. Here, Cephalon hired Clarion to assist in developing a business and marketing plan to maximize the commercial success of its modafinil drugs. As such, the FTC argues that because Clarion did not perform any legal function, communications to them fall outside of the attorney-client privilege.

Cephalon responds that the test advanced by the FTC narrows the scope of the attorney-client privilege in a manner that is squarely at odds with the principles articulated by the United States Supreme Court in Upjohn Co. v. United States, 449 U.S. 383 (1981). Instead, Cephalon urges us to follow In re Flonase Antitrust Litig., 879 F. Supp. 2d 454 (E.D. Pa. 2012), where, the district court concluded that the approach adopted in cases like Bristol Myers Squibb was too narrow, and would "lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." In re Flonase, 879 F. Supp. 2d at 459 (quoting In re Bieter, 16

F.3d at 938). The <u>Flonase</u> court found that it was more appropriate to focus upon whether the non-employee, by virtue of his or her role as a consultant, possesses or has access to confidential information which is necessary for the provision of legal advice to the company. <u>Id.</u> at 460. Essentially, under the approach adopted in <u>Flonase</u>, consultants are treated similarly to employees for purposes of the privilege analysis, and communications with consultants are privileged as long as they "were kept confidential and made for the purpose of obtaining or providing legal advice." <u>Id.</u> (citing <u>Trs. Of Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc.</u>, 266 F.R.D. 1, 8 (D.D.C. 2010)).

      We agree with the district court in <u>Flonase</u>, and the other courts that have adopted this broader approach to determining whether a consultant is the "functional equivalent" of an employee for purposes of the attorney-client privilege. Focusing on whether the communication to the consultant was kept confidential and made for the purpose of providing or obtaining legal advice is more consistent with the principles articulated by the United States Supreme Court in <u>Upjohn</u>. In that case, the Supreme Court rejected the "control-center" test that had been applied previously, and found that the realities of the manner in which corporations function—through their employees—required that communications with those employees be protected if kept confidential and necessary for the purpose of legal advice. <u>Upjohn</u>, 449 <u>U.S.</u> at 391-92. In the corporate setting, it is necessary for a company's attorneys and its non-lawyer employees to collaborate to ensure that the corporation complies with the law. <u>Upjohn</u>, 449 U.S. at 392. This is particularly true in the pharmaceutical industry, where marketing and business strategies are inextricably tied to regulatory, antitrust and intellectual property issues.

11

It makes little sense to impose additional requirements for extending the privilege to independent contractors merely because they are not on the corporate payroll. In re Copper, 200 F.R.D. at 219. The difference is only one of formality, and does not in itself diminish the need for the attorney and non-lawyer to collaborate to ensure that the corporation is complying with the law. Extending the privilege to a consultant performing a role similar to that of an employee, to the same extent as it applies to a corporate employee, simply "reflects the reality that 'corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes.'" In re Flonase, 879 F.Supp. 2d at 460 (quoting Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 269 (5th ed. 2007)). Where a consultant performs a similar role to an employee, confidential communications made for the purpose of obtaining or providing legal advice should be subject to the attorney-client privilege regardless of whether the consultant was hired for a litigation or business purpose.

With this legal standard in mind, and after reviewing the documents withheld or redacted by Cephalon, we conclude that the Clarion documents fall squarely within the attorney-client privilege. Clarion was performing a role for Cephalon substantially identical to that of employees.[1] Indeed, aside from the formal aspects of the relationship between Clarion and Cephalon, the consultants were indistinguishable from the Cephalon employees. Clarion's

---

[1] There is one notable exception to this finding. One of the documents at issue is an engagement letter authored by Clarion which sets out its proposals for the consulting project. (Challenge No. 20.) Cephalon redacted a portion of this letter which it claims reflects its attorneys' opinions regarding how to obtain the strongest patent protection for its modafinil products. Clarion had not yet been hired as a consultant when this letter was drafted, and it cannot reasonably be said to have been the "functional equivalent" of an employee when these communications were made. Accordingly, an unredacted version of this document shall be produced.

consultants worked closely with Cephalon employees to provide managerial support and strategic advice, and participated in making presentations to Cephalon's senior management regarding commercial and regulatory strategy for Cephalon's modafinil products. (Brooke Aff., ¶¶ 8-9.) Clarion personnel were in fact considered part of Cephalon's BST, had dedicated office space within Cephalon, and were subject to confidentiality agreements. (Id., ¶¶ 5-9.) In all material aspects, Clarion's consultants were the functional equivalent of the Cephalon employees tasked with developing marketing and regulatory strategies for its modafinil products.

A thorough review of the withheld and redacted documents also reveals that these communications are either recitations of legal advice from Cephalon's attorneys or requests for legal advice from the BST and Clarion. Nearly all of the challenged documents are portions of presentations given by Clarion and the BST to senior management at Cephalon. Most of the redacted portions of the presentations are analyses of the strength of Cephalon's modafinil-related intellectual property, and estimates regarding the timing of generic entry into the market in various scenarios. (See, e.g., Challenge Nos. 24-28, 37-41.) These analyses and estimates were provided by Cephalon's in-house and patent attorneys and constitute legal advice. (See Hrubiec Aff., ¶¶ 11-30.) The other redacted portions of the BST presentations contain follow-up questions for Cephalon's attorneys regarding the regulatory, antitrust and intellectual property impact of certain strategic proposals.[2] These requests for legal advice were made by the BST to the Cephalon attorneys that it was working closely with, and were necessary for the development of its modafinil business strategy. In short, the redacted and withheld portions of the documents

---

[2] It should also be noted that many of the same redactions appear in multiple documents, as many of the documents are drafts of the same presentations. Accordingly, the number of communications that have been withheld is far fewer than might be implied by the number of redacted portions of the documents at issue.

13

shared with Clarion were made for the purpose of obtaining or providing legal advice related to the regulatory and intellectual property implications of the BST's marketing strategy for Cephalon's modafinil products.

### C. Documents Created by Cephalon Non-Attorney Employees

The final category of documents challenged by the FTC consists of fifteen documents that were created by employees at Cephalon who are not attorneys. The FTC argues that these documents are business-related, and were not created for the purpose of obtaining legal advice. In support of its argument, the FTC notes that Cephalon's privilege log reflects that many of these documents were sent to other non-attorney employees at Cephalon, and certain documents were not circulated to attorneys at all. (See, e.g., Challenge Nos. 67, 71, 76-77, 87.) For other documents, the FTC argues that Cephalon's privilege log entries are either incomplete or so vague that they are insufficient to establish the privilege.

Initially, we note that "[a] document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." Santrade, Ltd. v. Gen. Elec. Co., 150 F.R.D. 539, 545 (E.D.N.C.1993). Communications shared by non-attorney employees may be privileged if they were made in order to relay information requested by attorneys, or to disseminate legal advice given by those attorneys so that the corporation's employees act appropriately. Id.; see also SmithKline Beecham Corp., 232 F.R.D. at 477. Accordingly, although we recognize that some of the communications at issue in this final category were between Cephalon employees who were not attorneys, that fact is not dispositive on the issue of whether those communications are subject to the attorney-client privilege. Again, the focus of the inquiry is on whether those communications were for the purpose of gathering information

14

necessary for Cephalon's attorneys to render legal advice, or were made in order to disseminate legal advice from those attorneys throughout the company.

Although we find merit to the FTC's concerns about whether the privilege log has sufficient detail to establish the application of the attorney-client privilege, a thorough review of the documents in this category reflects that they are privileged.  Many of these documents were prepared by Cephalon's employees to provide information to its attorneys regarding the status of its intellectual property filings, its clinical testing of pharmaceuticals or issues that arose in draft agreements with other pharmaceutical companies.  Other documents are requests by non-attorney employees for legal advice on regulatory filings or sales documents.  The remaining documents are responses by Cephalon's attorneys to those requests for legal advice.

More specifically, one document provides a Cephalon attorney with details regarding other pharmaceutical companies in order to obtain his opinion on the terms of a collaborative agreement between the two companies. (Challenge No. 61.)  Several documents are drafts of a spreadsheet concerning another company's assets, which was requested by in-house counsel to allow him to provide an opinion on antitrust issues. (Challenge Nos. 66-68; Barndt Aff., ¶ 6.)  Two of the identified documents are handwritten letters, with attached data and analyses, from a Cephalon scientist to counsel in response to counsel's request for pharmaceutical testing information relevant to the infringement litigation. (Challenge Nos. 85, 90.)  These documents, which all constitute communications to Cephalon attorneys by corporate employees in order to further counsel's ability to provide legal advice, are subject to attorney-client privilege.

In other documents drafted by non-attorney employees, counsel is asked their advice regarding either regulatory filings or the legal accuracy of certain sales documents.  (Challenge

15

Nos. 76, 81; Zakreski Aff. ¶¶ 25, 28.)  Similarly, another document requests counsel's advice on certain draft letter agreements.  (Challenge Nos. 83-84; Hrubiec Aff., ¶ 36.)  Also included in this category of documents is an email chain between Cephalon's employees and its attorneys concerning Cephalon's modafinil patents, and the impact of the then-pending Provigil infringement litigation.  (Challenge No. 87; Hrubiec Aff. ¶ 38.)  These documents all constitute requests for legal advice by Cephalon's non-attorney employees.

Finally, the remaining documents in this category directly reflect legal advice rendered by Cephalon's attorneys.  Certain documents contain handwritten notes regarding the terms of a draft agreement with a generic pharmaceutical company.  (Challenge Nos. 71-72, 78; Zakreski Aff. ¶ 26; Barndt Aff., ¶¶ 7-8.)  Another document is a database of certain intellectual property owned by Cephalon, which was prepared at the request of in-house counsel and contains comments by Cephalon's patent attorneys.  (Challenge No. 77; Hrubiec Aff., ¶ 34.)  These documents all contain notes created by Cephalon's attorneys and constitute legal advice from counsel to Cephalon's non-attorney employees.

A thorough review of the documents in this category demonstrates that they were properly withheld or redacted in order to protect the confidentiality of communications between Cephalon's employees and its attorneys regarding intellectual property, regulatory and contractual issues.

### IV.     Conclusion

For the reasons set forth, the Court concludes that each of the documents at issue was properly withheld or redacted by Cephalon as communications subject to the attorney-client privilege.

Our Order follows.

17