**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION,<br>600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20580 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 2:08-cv-2141 |
| | : | |
| CEPHALON, INC.,<br>41 Moores Road<br>Frazer, Pennsylvania 19355 | : | |
| | : | |
| Defendant. | : | |

**STIPULATED ORDER FOR PERMANENT INJUNCTION
AND EQUITABLE MONETARY RELIEF**

Plaintiff, the Federal Trade Commission ("Commission"), filed its Complaint for

Injunctive Relief, subsequently amended as Plaintiff Federal Trade Commission's First

Amended Complaint for Injunctive Relief, ("Complaint"), in this matter pursuant to Section

13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). The Commission,

Cephalon, Inc. ("Cephalon") and Teva Pharmaceutical Industries Ltd. ("Teva") have reached an

agreement to resolve this case through settlement, and without trial or final adjudication of any

issue of fact or law, and stipulate to entry of this Stipulated Order for Permanent Injunction and

Equitable Monetary Relief ("Order") to resolve all matters in dispute in this action.

**THEREFORE, IT IS ORDERED** as follows:

1

## DEFINITIONS

For purposes of this Order, the following definitions apply:

1.      "Commission" means the United States Federal Trade Commission.

2.      "Cephalon" means Cephalon, Inc.

3.      "Cephalon Group" means Cephalon, any joint venture, subsidiary, division, group, or affiliate Controlled currently or in the future by Cephalon that engages in Commerce in the United States, their successors and assigns, and the respective directors, officers, employees, agents and representatives acting on behalf of each.

4.      "Teva" means Teva Pharmaceutical Industries Ltd.

5.      "Teva US Entities" means any joint venture, subsidiary, division, group, or affiliate Controlled currently or in the future by Teva that engages in Commerce in the United States.

6.      "Teva Group" means Teva, Teva US Entities, their successors and assigns, and the respective directors, officers, employees, agents, and representatives acting on behalf of each.

7.      "Cephalon Parties" mean Cephalon, Cephalon Group, Teva and Teva Group.

8.      "ANDA" means an Abbreviated New Drug Application filed with the United States Food and Drug Administration pursuant to Section 505(j) of the Federal Food, Drug and Cosmetic Act,  21 U.S.C.§ 355(j).

9.      "ANDA Filer" means a party to a Brand/Generic Settlement who controls an ANDA for the Subject Drug Product or has the exclusive right under such ANDA to distribute the Subject Drug Product.

10.     "ANDA Product" means a Drug Product manufactured under an ANDA.

11.   "Brand/Generic Settlement" means any agreement or understanding that settles a Patent Infringement Claim in or affecting Commerce in the United States.

12.   "Brand/Generic Settlement Agreement" means a written agreement that settles a Patent Infringement Claim in or affecting Commerce in the United States.

13.   "Branded Subject Drug Product" means a Subject Drug Product marketed, sold or distributed in the United States under the proprietary name identified in the NDA for the Subject Drug Product.

14.   "Commerce" has the same definition as it has in 15 U.S.C. § 44.

15.   "Control" or "Controlled" means the holding of more than fifty percent (50%) of the common voting stock or ordinary shares in, or the right to appoint more than fifty percent (50%) of the directors of, or any other arrangement resulting in the right to direct the management of, the said corporation, company, partnership, joint venture or entity.

16.   "Drug Product" means a finished dosage form (e.g., tablet, capsule, or solution), as defined in 21 C.F.R. § 314.3(b), that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients.

17.   "NDA" means a New Drug Application filed with the United States Food and Drug Administration pursuant to Section 505(b) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(b), including all changes or supplements thereto which do not result in the submission of a new NDA.

18.   "NDA Holder" means a party to a Brand/Generic Settlement that controls the NDA for the Subject Drug Product or has the exclusive right to distribute the Branded Subject Drug Product.

3

19.     "U.S. Patent" means any patent issued by the United States Patent and Trademark Office,
        including all renewals, derivations, divisions, reissues, continuations, continuations-in
        part, modifications or extensions thereof.

20.     "Patent Infringement Claim" means any allegation threatened in writing or included in a
        complaint filed with a court of law, that an ANDA Product may infringe any U.S. Patent
        held by, or exclusively licensed to, an NDA Holder.

21.     "Payment by the NDA Holder to the ANDA Filer" means transfer of value by the NDA
        Holder to the ANDA Filer (including, but not limited to, money, goods or services),
        regardless of whether the ANDA Filer purportedly transfers value in return, where such
        transfer is either (i) expressly contingent on entering a Brand/Generic Settlement
        Agreement, or (ii) agreed to during the 60 day period starting 30 days before executing a
        Brand/Generic Settlement Agreement and ending 30 days after executing a
        Brand/Generic Settlement Agreement.  The following, however, are not Payment by the
        NDA Holder to the ANDA Filer:

        a.      compensation for saved future litigation expenses not to exceed a maximum limit,
                which is initially set at seven million dollars ($7,000,000), and shall be increased
                (or decreased) as of January 1 of each year by an amount equal to the percentage
                increase (or decrease) from the previous year in the annual average Producer Price
                Index for Legal Services (Series Id. PCU5411--5411--) published by the Bureau
                of Labor Statistics of the United States Department of Labor, or its successor;

        b.      provisions in a Brand/Generic Settlement Agreement providing a date after which
                an ANDA Filer can begin selling, offering for sale or distributing the Subject
                Drug Product;

4

   c.      provisions in a Brand/Generic Settlement Agreement through which the NDA

Holder provides the ANDA Filer an exclusive license to the Subject Drug

Product;

   d.      provisions in a Brand/Generic Settlement Agreement that permit an ANDA Filer

to begin selling, offering for sale, or distributing the Subject Drug Product once

another drug company begins selling, offering for sale, or distributing the Subject

Drug Product;

   e.      an agreement to settle or resolve a different litigation claim, so long as that

separate agreement independently complies with the terms of this Order

(including the timing provisions above); and

   f.      continuation or renewal of a pre-existing agreement so long as (i) the pre-existing

agreement was entered at least 90 days before the relevant Brand/Generic

Settlement Agreement, (ii) the terms of the renewal or continuation, including the

duration and the financial terms, are substantially similar to those in the pre-

existing agreement, and (iii) entering the continuation or renewal is not expressly

contingent on agreeing to a Brand/Generic Settlement.

22.     "Related Case" means (a) any of the following cases, or any case consolidated with or

merged into the following cases: *King Drug Co., et al. v. Cephalon, Inc., et al.*, No 06-

1797 (E.D. Pa.) ("Direct Purchaser Class Case"); *Vista Healthplan, Inc., et al. v.

Cephalon, Inc., et al.*, No. 06-1833 (E.D. Pa.) ("End Payor Class Case"); *Apotex, Inc. v.

Cephalon, Inc., et al.*, No. 06-2768 (E.D. Pa.); *Rite Aid Corp. v. Cephalon, Inc., et al.*,

No. 09-3820 (E.D. Pa.); *Walgreen Co. v. Cephalon, Inc., et al.*, No. 09-3956 (E.D. Pa.);

and *Giant Eagle, Inc. v. Cephalon, Inc., et al.*, No. 10-5164 (E.D. Pa.); or (b) any other

government investigation or litigation that is threatened in writing or filed that seeks to recover damages or equitable monetary relief based on alleged anticompetitive or other unlawful practices by the Cephalon Parties in connection with (i) the procurement, listing or enforcement of patents related to the drug Provigil®, (ii) FDA exclusivities related to the drug Provigil®, or (iii) settling litigation related to the drug Provigil®.

23.   "Subject Drug Product" means the Drug Product for which one or more Patent Infringement Claims are settled under a given Brand/Generic Settlement. For purposes of this Order, the Drug Product of the NDA Holder and the ANDA Filer to the same Brand/Generic Settlement shall be considered to be the same Subject Drug Product.

24.   "Verified Accounting" means a written statement by a representative of the Cephalon Parties, made pursuant to 28 U.S.C. § 1746, that verifies the relevant details of each relevant settlement and judgment.

## FINDINGS

1.    This Court has jurisdiction over the parties and the subject matter of this action. Teva has stipulated that, for purposes of this Order alone, the Court has personal jurisdiction over Teva.

2.    Venue for this matter is proper in this Court under Sections 5(a) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 53(b).

3.    The Complaint charges that Cephalon engaged in anticompetitive acts that constitute an unfair method of competition in violation of Sections 5(a) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a) and 53(b), by entering agreements that delayed the launch of generic equivalents of the name-brand drug Provigil®.

4.  In *FTC v. Actavis*, 133 S. Ct. 2223 (2013), the United States Supreme Court held that certain agreements to settle patent litigation can violate the United States antitrust laws, including the FTC Act.

5.  Cephalon has answered the Complaint denying the charges, and disputes that the Commission is entitled to obtain relief, including monetary relief under Section 13(b) of the FTC Act.

6.  Cephalon admits the facts necessary to establish the personal and subject matter jurisdiction of this Court in this matter only.

7.  The Court denied Cephalon's motion for summary judgment.

8.  The Commission and Cephalon have agreed to stipulate to entry of this Order to resolve the litigation between them.

9.  Cephalon waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear its own costs and attorney fees in this action.

10. Cephalon waives all rights to appeal or otherwise challenge or contest the validity of this Order.

11. This Order does not constitute any evidence against the Cephalon Parties, or an admission of liability or wrongdoing by the Cephalon Parties in this case, any Related Case, or any other case or proceeding. This Order shall not be used in any way, as evidence or otherwise, in any Related Case or other proceeding; *provided that*, nothing in this provision prevents the Commission from using this Order in this case, in any proceeding regarding enforcement or modification of this Order, or as otherwise required by law.

12.     Entry of the Order satisfies the requests for relief made by the FTC in its complaint and is

in the public interest.

## STIPULATIONS

1.      Teva stipulates that, in return for good and valuable consideration, the receipt and

sufficiency of which is hereby acknowledged, Teva agrees to be fully bound by the terms

of this Order.

2.      Teva stipulates that it will not object to the Commission's right to seek relief under this

Order against Teva to the same extent the Commission can seek relief against Cephalon

(or Cephalon's successors and assigns).  Teva does not otherwise waive its right to

contest any enforcement action against it.

3.      For purposes of this Order alone, Teva does not contest personal jurisdiction of this Court

over Teva.  Teva is an Israeli company with its principal place of business at 5 Basel

Street, Petah Tikva, 49131, Israel.

4.      Teva stipulates that it is the ultimate corporate parent of Cephalon.

5.      Teva stipulates that venue for this matter is proper in this Court under Sections 5(a) and

13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 53(b).

6.      Teva stipulates that all stipulations herein are made on behalf of, and include, Teva and

Teva Group.

7.      The Cephalon Parties stipulate that they shall comply with the provisions of this Order

pending its entry by the Court.

## ORDER

### I. Prohibited Agreements

**IT IS ORDERED** that

A.    From the date this Order is signed by Cephalon and Teva, the Cephalon Parties are prohibited from, together or separately, entering into any Brand/Generic Settlement that includes: (1) Payment by the NDA Holder to the ANDA Filer; and (2) an agreement by the ANDA Filer not to research, develop, manufacture, market or sell the Subject Drug Product for any period of time,

*provided, however,* that any agreement entered into by an entity prior to that entity becoming part of the Cephalon Parties is not subject to the terms of this Order;

*provided further, however*, that the Cephalon Parties may enter into any written agreement that receives the prior approval of the Commission. Within thirty (30) days of receiving a request for prior approval under this paragraph, the Director of the Bureau of Competition (or his or her designee) shall consider the request in good faith and shall notify the requesting party in writing whether Commission staff believes the relevant agreement raises issues under Section 5 of the FTC Act and the reasons for such a belief, or this Order shall be deemed not to preclude the requesting party from entering into the subject written agreement.

B.    Nothing in this Order shall prohibit the Cephalon Parties from purchasing, merging with, or otherwise acquiring or being acquired by any party with which a Cephalon Party has entered a Brand/Generic Settlement.

C.    In the event of a material change in the law governing the antitrust implications of Brand/Generic Settlements, the Commission will consider, in good faith, modifications to this Order proposed by the Cephalon Parties.

9

## II.   Equitable Monetary Relief

**IT IS FURTHER ORDERED** that

A.     The Cephalon Parties shall pay  One Billion and Two Hundred Million Dollars (US$ 1,200,000,000) as equitable monetary relief, which shall be used for a settlement fund ("Settlement Fund") in accordance with the terms of this Order, including the Settlement Fund Disbursement Agreement, attached hereto as Exhibit A.

B.     Subject to Paragraphs II.C and II.D, no later than the thirtieth day following the date of entry of this Order, the Cephalon Parties shall deposit the Settlement Fund into an escrow account to be designated by the Commission ("Settlement Account") and to be administered by the Commission or its agent.  As set forth in the Settlement Fund Disbursement Agreement, the amount of the Settlement Fund that is deposited into the Settlement Account shall be held in trust to satisfy the amount of any settlement or judgment in a Related Case.

C.     Any amount that the Cephalon Parties have paid in settlement or judgment in the Related Cases prior to the thirtieth day following the date of entry of this Order shall be credited against the Settlement Fund, and the total amount to be deposited by the Cephalon Parties into the Settlement Account shall be reduced accordingly.

D.     If the Cephalon Parties have signed a binding settlement agreement or binding term sheet to resolve a Related Case prior to the thirtieth day following the date of the entry of this Order, the amount agreed to be paid in settlement of such Related Case shall be credited against the Settlement Fund, and the amount to be deposited by the Cephalon Parties into the Settlement Account shall be reduced accordingly.  In the event that such a settlement is disapproved by the court or otherwise terminated, the Cephalon Parties shall deposit the amount of any uncommitted settlement funds into the Settlement Account within four (4) months of such

10

disapproval or termination, unless the Director of the Bureau of Competition or his or her

designee determines that, for good cause shown, the monies may continue to be maintained by

the Cephalon Parties for settlement of Related Cases for such period as the Director of the

Bureau of Competition or his or her designee prescribes.

E.     The Cephalon Parties shall submit to the Commission a Verified Accounting of

all individual credits against the Settlement Fund under Paragraphs II.C and II.D no later than

sixty (60) days after the date of the entry of this Order. The Cephalon Parties shall submit the

Verified Accounting to the Secretary of the Commission and send an electronic version of the

Verified Accounting to the Compliance Division of the Bureau of Competition at

bccompliance@ftc.gov.

F.     The payment provided for herein is provided for purposes of settlement only. No

portion of the payment shall constitute, or shall be construed as constituting, a payment in lieu of

treble damages, fines, penalties, punitive damages or forfeitures.

### III. Reporting Requirements

**IT IS FURTHER ORDERED** that:

A.     The Cephalon Parties shall submit to the Commission a verified written report

setting forth in detail the manner and form in which the Cephalon Parties have complied and are

complying with this Order:

1.     Within sixty (60) days after entry of this Order, and

2.     On the first anniversary of entry of this Order, and annually thereafter for

nine (9) years.

B.     The Cephalon Parties shall include with each verified written report required by

this provision, a copy of any additional agreement with a party to a Brand/Generic Settlement to

11

which a Cephalon Party is also signatory if (i) the relevant Brand/Generic Settlement Agreement includes an agreement by the ANDA Filer not to research, develop, manufacture, market or sell the Subject Drug Product for any period of time, and (ii) the relevant additional agreement is entered within a year of executing the Brand/Generic Settlement Agreement, *provided that,* the Cephalon Parties do not need to submit any additional agreement that they submitted to the Commission with a prior verified written report required by this provision;

      C.     The Cephalon Parties shall submit each report required under this paragraph to the Secretary of the Commission and shall send an electronic copy of each report to the Compliance Division of the Bureau of Competition of the Commission at bccompliance@ftc.gov.

      D.     No information or documents obtained by the means provided in this Paragraph shall be divulged by the Commission to any person other than an authorized representative of the Commission, except in the course of a legal proceeding regarding enforcement or modification of this Order, or as otherwise required by law.

      E.     This Order does not alter the reporting requirements of the Cephalon Parties pursuant to Section 1112 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.

### IV. Change of Corporate Control

**IT IS FURTHER ORDERED** that

      A.     The Cephalon Parties shall notify the Commission at least thirty (30) days prior to any proposed dissolution, acquisition, merger, or consolidation of Teva that might affect compliance obligations arising out of this Order.

      B.     The Cephalon Parties shall submit any notice required under this paragraph to the Secretary of the Commission and shall send an electronic copy of the notification to the

Compliance Division of the Bureau of Competition of the Commission at

bccompliance@ftc.gov.

C.     No information or documents submitted pursuant to this Paragraph shall be

divulged by the Commission to any person other than an authorized representative of the

Commission, except in the course of a legal proceeding regarding enforcement or modification

of this Order, or as otherwise required by law.

## V.  Access to Information

A.     For the purpose of determining or securing compliance with this Order, subject to

any legally recognized privilege, and upon written request with reasonable notice to the

Cephalon Parties, the Cephalon Parties shall permit any duly authorized representative of the

Commission:

1.     Access, during office hours and in the presence of counsel, to all facilities

and access to inspect and copy, at the Cephalon Parties' expense, non-privileged books,

ledgers, accounts, correspondence, memoranda and other records and documents in the

possession or under the control of the Cephalon Parties reasonably related to this Order;

and

2.     Upon reasonable notice to the Cephalon Parties, to interview a reasonable

number of officers, directors, or employees of the Cephalon Parties, who may have

counsel present, regarding any such matters.

B.     No information or documents obtained by the means provided in this Paragraph

shall be divulged by the Commission to any person other than an authorized representative of the

Commission, except in the course of a legal proceeding regarding enforcement or modification

of this Order, or as otherwise required by law.

13

## VI.  Retention of Jurisdiction

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

## VII.  Expiration of Order

**IT IS FURTHER ORDERED** that this Order shall expire ten (10) years after the date it

is entered.

## VIII. Dismissal and Costs

This action shall be dismissed with prejudice.  Each party shall bear its own costs.

**SO ORDERED** this __17__ day of __June__ , 2015.


Hon. Mitchell S. Goldberg
UNITED STATES DISTRICT JUDGE

14

*SO STIPULATED AND AGREED*:

FOR PLAINTIFF FEDERAL TRADE COMMISSION:

_____     Date: _____
Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission

FOR CEPHALON, INC.:

_____     Date: 5/22 2015

Name: Siggi Olafsson

Title: President & CEO, Global Generic Medicines


_____     Date: _____

Name:

Title:


_____     Date: _____
James C. Burling
Wilmer Cutler Pickering Hale and Dorr LLP
COUNSEL FOR CEPHALON, INC.

15

*SO STIPULATED AND AGREED:*

FOR PLAINTIFF FEDERAL TRADE COMMISSION:

Date: 5/22/15

Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission

FOR CEPHALON, INC.:

Date: _____

Name:

Title:

Date: 5/21/2015

Name: Ildiko Mehes

Title: VP & GC , NA Generics

Date: 5/22/2015

James C. Burling
Wilmer Cutler Pickering Hale and Dorr LLP
COUNSEL FOR CEPHALON, INC.

15

FOR TEVA PHARMACEUTICAL INDUSTRIES LTD.:

_____          Date: 5/21/2015

Name:   Eyal Desheh

Title:   EVP and CFO

_____          Date: 5/21/15

Name:   **Dov P. Bergwerk**
        SVP, General Counsel-Corporate &
Title:           **Company Secretary**

_____          Date: 5/21/15

Jay P. Lefkowitz, P.C.
Kirkland & Ellis LLP
COUNSEL FOR TEVA PHARMACEUTICAL INDUSTRIES LTD.

*Federal Trade Commission v. Cephalon, Inc.*, CA 2:08-cv-2141-MSG

Exhibit A to Stipulated Order for Permanent Injunction and Equitable Monetary Relief

SETTLEMENT FUND DISBURSEMENT AGREEMENT

## SETTLEMENT FUND DISBURSEMENT AGREEMENT

Plaintiff, the Federal Trade Commission ("Commission"), Cephalon, Inc. ("Cephalon"),
and Teva Pharmaceutical Industries, Ltd. ("Teva") hereby enter into this Settlement Fund
Disbursement Agreement, which is Exhibit A to the Stipulated Order for Permanent Injunction
and Equitable Monetary Relief. The Settlement Fund Disbursement Agreement and the
Stipulated Order for Permanent Injunction and Equitable Monetary Relief are collectively
referred to herein as the "Order."

1.      Unless otherwise noted herein, the capitalized terms in this Settlement Fund
        Disbursement Agreement have the same meaning as in the Stipulated Order for
        Permanent Injunction and Equitable Monetary Relief.

## SETTLEMENT ACCOUNT

2.      The Settlement Fund required by the Order (except for monies credited against the
        Settlement Fund under Paragraph II of the Order) will be held in trust in an escrow
        account established and maintained by the Commission or its agent ("Settlement
        Account"). The Commission will provide the Cephalon Parties with instructions for
        wiring the Settlement Fund into the Settlement Account, as well as any other necessary
        paperwork or instructions. Disbursement of the proceeds of the Settlement Account shall
        be made by the Commission in accordance with the requirements of the Order.

3.      Any interest earned on amounts deposited into the Settlement Account will remain in the
        Settlement Account, and will become part of the Settlement Fund.

4.      The Commission may use the Settlement Fund to pay reasonable costs necessary to
        administer the Settlement Account. The Cephalon Parties will not be required to pay any
        additional monies, over and above the Settlement Fund required to be deposited pursuant

ii

to the Order, to cover any expenses, fees, or other costs associated with the Settlement Account.

5.      The Cephalon Parties may, no more frequently than once a month, submit a request to the Commission in writing for a statement of the remaining balance in the Settlement Account, and an itemized list of any disbursements made from the Settlement Account. Any such request shall be submitted to the Secretary of the Commission, and, on the same day, an electronic copy of the request shall be submitted to the Compliance Division of the Bureau of Competition of the Commission at bccompliance@ftc.gov and the Financial Management Office of the Commission at Finance@ftc.gov. The Chief Financial Officer of the Commission or his or her designee will provide the information requested within fifteen (15) business days.

## DISBURSEMENT OF FUNDS FROM THE SETTLEMENT ACCOUNT

6.      Except as provided for in this Settlement Fund Disbursement Agreement, the Settlement Fund shall be held in trust and used solely to satisfy the amount of any settlement (including associated fees, costs, and expenses) reached by the Cephalon Parties in a Related Case, or the amount of any judgment (including associated fees, costs, and expenses) against the Cephalon Parties in a Related Case, regardless of the date of that settlement or judgment.

7.      The Cephalon Parties shall submit a list of Related Cases that have not been settled and for which a judgment has not been entered ("Remaining Cases List") on or up to 30 (thirty) days before the five-year anniversary of the entry of this Order, and each year thereafter, until, in the good faith belief of the Cephalon Parties, settlements have been reached, or final judgments entered, in the relevant Related Cases. The Cephalon Parties

shall submit the Remaining Cases List to the Secretary of the Commission, and, on the

same day, transmit an electronic copy of the request to the Compliance Division of the

Bureau of Competition of the Commission at bccompliance@ftc.gov.  If the Cephalon

Parties do not submit a Remaining Cases List as provided in this paragraph, or the term

of the Order has expired, any monies remaining in the Settlement Account, less

reasonable administrative expenses, shall be paid to the Treasurer of the United States.

8.      To obtain disbursement from the Settlement Account as authorized by the Order, the

Cephalon Parties shall submit a written request for disbursement with the Commission

("Disbursement Request").  The Disbursement Request shall include:

a.      a reference to the Order;

b.      contact information, including business address, phone number and email address,

for the relevant contact person(s) for the Cephalon Parties ("Cephalon Parties'

Contact");

c.      the identity of the party or parties threatening or asserting a claim in the relevant

Related Case ("Settling Parties");

d.      contact information, including business address, phone number, e-mail address,

and relationship to the Settling Parties, for the contact person(s) for the Settling

Parties in the relevant Related Case ("Settling Parties' Contact");

e.      a copy of the settlement or judgment in the Related Case for which disbursement

is being sought;

f.      the complaint filed in the Related Case or other documents sufficient to show the

allegations and relief sought by the Settling Parties;

iv

g.    the amount of the settlement or judgment in the Related Case ("Disbursement Amount"); and

h.    the information necessary to wire the Disbursement Amount from the Settlement Account to the Settling Parties.

9.    The Cephalon Parties shall submit the Disbursement Request to the Secretary of the Commission, and on the same day, send an electronic copy of the request to the Compliance Division of the Bureau of Competition of the Commission at bccompliance@ftc.gov.

10.   Within ten (10) business days of receiving the Disbursement Request, the Director of the Bureau of Competition or his or her designee ("BC Director") shall

a.    if the Disbursement Request complies with the requirements of the Order, authorize transfer of the Disbursement Amount to the Settling Parties and notify the Cephalon Parties' Contact and the Settling Parties' Contact in writing that the transfer has been authorized; or

b.    if the BC Director believes that additional information is required to determine the whether the Disbursement Request complies with the requirements of the Order, notify the Cephalon Parties' Contact and the Settling Parties' Contact in writing and identify the additional information required; or

c.    if the BC Director believes that the Disbursement Request does not comply with the requirements of the Order, notify the Cephalon Parties' Contact and the Settling Parties' Contact and provide a written explanation why the Disbursement Request has been denied and how, in the BC Director's view, the Disbursement Request does not comply with the requirements of the Order.

v

11. Within ten (10) business days of receiving the information requested under Paragraph 10 above (if such information is requested), the BC Director shall

   a. if the Disbursement Request complies with the requirements of the Order, authorize transfer of the Disbursement Amount to the Settling Parties and notify the Cephalon Parties' Contact and the Settling Parties' Contact in writing that the transfer has been authorized; or

   b. if the BC Director believes that the Disbursement Request does not comply with the requirements of the Order, notify the Cephalon Parties' Contact and the Settling Parties' Contact and provide a written explanation why the Disbursement Request has been denied and how, in the BC Director's view, the Disbursement Request does not comply with the requirements of the Order.

12. If the Commission and the Cephalon Parties cannot agree on whether a Disbursement Request complies with the requirements of the Order, either party may petition the Court for a determination.

13. Any settlement of the Direct Purchaser Class Case or the End Payor Class Case that is approved by the Court complies with the Order, and a Disbursement Request submitted for any such settlement will be approved provided the requirements of Paragraph 8 are met.

14. Disbursement Requests shall be authorized in the order they are submitted to the Commission by the Cephalon Parties.

15. If this Settlement Fund Disbursement Agreement or any of its provisions are ruled invalid or unenforceable, in whole or in part, the Commission and the Cephalon Parties agree to work together on modifications to effectuate the intent of the settlement.

vi

## CONFIDENTIALITY

16.    Any information submitted under this Settlement Fund Disbursement Agreement shall
       not be divulged by the Commission to any person other than an authorized representative
       of the Commission, except in the course of a legal proceeding regarding enforcement or
       modification of this Order, or as otherwise required by law.

## CLOSING THE SETTLEMENT ACCOUNT

17.    The Commission shall close the Settlement Account if the entire Settlement Fund (less
       any remaining reasonable administrative costs) has been fully disbursed or, in accordance
       with Paragraph 7, the Commission pays any monies remaining in the Settlement Account
       (less any remaining reasonable administrative costs) to the Treasurer of the United States.
       The BC Director shall provide written notice to the Cephalon Parties of the intent to close
       the Settlement Account no later than thirty (30) days in advance of closing the Settlement
       Account, and shall provide written notice to the Cephalon Parties when the Settlement
       Account is closed.

18.    The Commission will not close the Settlement Account until all reasonable administrative
       costs have been paid.

vii